## SUSAN MARANDINO *v.* PROMETHEUS PHARMACY ET AL.
### (SC 18135)

Rogers, C. J., and Norcott, Katz, Vertefeuille and McLachlan, Js.*

* This case was argued prior to the implementation of the policy of this court to hear all cases en banc.

Argued April 29, 2009—officially released January 26, 2010

*Jason M. Dodge*, with whom, on the brief, was *Douglas L. Drayton*, for the appellants-appellees (defendants).

*Angelo Paul Sevarino*, for the appellee-appellant (plaintiff).

*Joram Hirsch* and *Robert F. Carter* filed a brief for the Connecticut Trial Lawyers Association as amicus curiae.

*Opinion*

VERTEFEUILLE, J. In this consolidated appeal, the defendants, Prometheus Pharmacy and CNA RSKCo Services, appeal and the plaintiff, Susan Marandino, cross appeals from the judgment of the Appellate Court,

which had affirmed a finding by a workers' compensation commissioner that the plaintiff had a compensable arm injury but reversed the finding that she also had a compensable knee injury.[1] *Marandino* v. *Prometheus Pharmacy*, 105 Conn. App. 669, 686, 939 A.2d 591 (2008). On appeal, the defendants claim that the Appellate Court improperly concluded that the plaintiff was entitled to temporary total incapacity benefits under General Statutes § 31-307 (a)[2] of the Workers' Compensation Act (act) after having received permanent partial

[1] The defendants appealed, and the plaintiff cross appealed, from the judgment of the Appellate Court. We granted the defendants' petition for certification to appeal limited to the following question: "Did the Appellate Court properly determine that the [plaintiff] was entitled to temporary total benefits after having received permanent partial disability benefits pursuant to a voluntary agreement?" *Marandino* v. *Prometheus Pharmacy*, 286 Conn. 916, 945 A.2d 977 (2008).

We granted the plaintiff's petition for certification to appeal limited to the following question: "Did the Appellate Court properly determine that the workers' compensation commissioner improperly relied on the report by Vincent Santoro, an orthopedic surgeon?" *Marandino* v. *Prometheus Pharmacy*, 286 Conn. 917, 945 A.2d 977 (2008).

[2] General Statutes § 31-307 (a) provides: "If any injury for which compensation is provided under the provisions of this chapter results in total incapacity to work, the injured employee shall be paid a weekly compensation equal to seventy-five per cent of the injured employee's average weekly earnings as of the date of the injury, calculated pursuant to section 31-310, after such earnings have been reduced by any deduction for federal or state taxes, or both, and for the federal Insurance Contributions Act made from such employee's total wages received during the period of calculation of the employee's average weekly wage pursuant to section 31-310; but the compensation shall not be more than the maximum weekly benefit rate set forth in section 31-309 for the year in which the injury occurred. No employee entitled to compensation under this section shall receive less than twenty per cent of the maximum weekly compensation rate, as provided in section 31-309, provided the minimum payment shall not exceed seventy-five per cent of the employee's average weekly wage, as determined under section 31-310, and the compensation shall not continue longer than the period of total incapacity."

Technical changes not relevant to this appeal have been made to § 31-307 since the time of the plaintiff's claim for benefits. See Public Acts 2006, No. 06-84. For purposes of convenience, we refer herein to the current revision of the statute.

disability benefits pursuant to a voluntary agreement. In her cross appeal, the plaintiff claims that the Appellate Court improperly concluded that the workers' compensation commissioner for the sixth district (commissioner) improperly relied on a report by Vincent Santoro, an orthopedic surgeon, in reaching the commissioner's decision that the plaintiff's arm and knee injuries were causally related. We affirm in part and reverse in part the judgment of the Appellate Court.

The Appellate Court opinion sets forth the following facts and procedural history. "In February, 1999, while employed by Prometheus Pharmacy, the plaintiff fell at her place of work and sustained an injury to her master right elbow. Beginning in July, 1999, the plaintiff underwent surgeries and received treatment for her arm injury from Andrew Caputo, an orthopedic surgeon. Specifically, on July 12, 1999, the plaintiff underwent an open reduction internal fixation of her right radial head fracture with left iliac crest bone graft, which was secured by a titanium plate, as well as a right carpal tunnel release. In December, 1999, Caputo discovered that there was a crack in the titanium plate and that surgery was required to fix it. Therefore, on January 19, 2000, the plaintiff underwent a right radial head replacement and release of her right elbow contracture.

"On March 1, 2001, the plaintiff underwent her final arm surgery, a right anterior subcutaneous ulnar nerve transposition and excision of deep sutures on her right lateral elbow. Thereafter, the plaintiff underwent an independent medical evaluation with Andrew Nelson, a physician. He diagnosed the plaintiff with, among other things, right upper extremity chronic regional pain syndrome, which he opined was directly and causally related to the injury sustained when the plaintiff fell at her place of work and that the plaintiff's prognosis was poor to fair. He also opined that she was significantly impaired, requiring ongoing narcotic medication

and that '[a]t best she would only be able to utilize her right upper extremity as a sedentary assistant unless additional evaluation and possible intervention provided her function by way of range of motion, strength, and decreased pain.' Nelson opined that the plaintiff would reach maximum medical improvement in March, 2002, approximately twelve months after her final surgery on March 1, 2001. In 2002, Nelson authored a second independent medical evaluation in which he indicated that there was no significant change in the plaintiff's complaints or physical evaluation since the November 9, 2001 independent medical examination and that the plaintiff suffered from a permanent partial impairment of 41 percent of the right upper extremity.

"Beginning in June, 2000, and through the time of the hearings before the commissioner, the plaintiff was treated by a pain specialist, Steven Beck, for her arm injury. Beck's notes indicate an increase in pain, sensitivity and immobility over time, as well as an increase in narcotic medication over time to control the plaintiff's arm pain. Beck testified at his deposition that the plaintiff suffers from complete regional pain syndrome and reflex sympathetic dystrophy.

"On April 24, 2002, the plaintiff reached maximum medical improvement and entered into a voluntary agreement to receive permanent partial disability benefits, in accordance with General Statutes § 31-308, on the basis of a 41 percent permanent partial impairment of her right upper extremity. The plaintiff received benefits in accordance with that agreement for 85.28 weeks.

"In the meantime, in January, 2000, between the plaintiff's first and second arm surgeries, she suffered an injury to her right knee. The plaintiff was in her home and hurriedly was ascending her basement stairs to answer a telephone that was ringing on the first floor when she felt herself fall backward. To secure her bal-

ance, and fearful about the crack in the plate in her right arm, the plaintiff reached out for the railing, located on her right side, with her left arm. In doing so, she jerked her body and twisted her right knee. The plaintiff was treated by [Santoro] . . . for her knee injury and underwent two surgeries for an osteochondral lesion.

"At some point, after the voluntary agreement was entered into, a hearing was scheduled before the commissioner in which the plaintiff sought to receive benefits for total incapacity. Hearings were held before the commissioner on the matter, and he made several findings, specifically, that the plaintiff had a compensable 41 percent permanent partial disability of her master right arm, that her knee injury was compensable and that she was totally incapacitated and entitled to benefits in accordance with § 31-307.[3] The defendants appealed to the [compensation review board (board)], challenging the commissioner's findings that the plaintiff's knee injury was compensable and that the plaintiff was totally incapacitated and entitled to benefits in accordance with § 31-307. The defendants [did] not challenge the commissioner's finding that the plaintiff has a compensable 41 percent permanent partial disability of her master right arm.[4] The board affirmed the findings of the commissioner and dismissed the defendants' appeal." Id., 671–74.

Thereafter, the defendants appealed from the decision of the board to the Appellate Court. On appeal to the Appellate Court, the defendants claimed that: (1)

[3] The defendants concede that the plaintiff is eligible for additional discretionary benefits in accordance with General Statutes § 31-308a.

[4] At oral argument in the Appellate Court, the defendants conceded that the Appellate Court could sustain the board's affirmance of the commissioner's finding that the plaintiff was unemployable and, thus, totally incapacitated on the basis of the 41 percent permanent partial disability of the plaintiff's master right arm. In other words, sustaining the commissioner's finding that the plaintiff is totally incapacitated would not require this court to sustain the commissioner's finding that the knee injury is compensable.

"the plaintiff is not entitled to total incapacity benefits under § 31-307 . . . because the plaintiff reached maximum medical improvement and entered into a voluntary agreement to receive permanent partial disability benefits, she is unable to request total incapacity benefits without demonstrating a change in [her] medical condition since entering into the agreement . . . [and] that even if the plaintiff can demonstrate a medical change sufficient to seek modification of her award, she is not entitled to total incapacity benefits as she has not exercised reasonable diligence in securing employment and, as such, has not demonstrated a diminished earning capacity in accordance with § 31-307"; id., 681–82; and (2) that the board improperly sustained "the commissioner's finding that the plaintiff's knee injury was compensable . . . [because] the reports on which the commissioner relied, in part, to make this finding should not have been admitted into evidence . . . [and] that there was insufficient evidence in the record on which the commissioner could rely to find that the plaintiff's knee injury was causally related to the prior compensable arm injury." Id., 674.

The Appellate Court concluded that the board properly affirmed the commissioner's award of total incapacity benefits to the plaintiff. Id., 685–86. Specifically, the Appellate Court concluded that the plaintiff had presented sufficient evidence to establish that the condition of her right arm had worsened from the time that she had entered into the voluntary agreement and that she had met her burden of establishing that she was unemployable by presenting evidence of a vocational rehabilitation expert. Id., 684–86. A majority of the Appellate Court panel further concluded that the board had improperly affirmed the decision of the commissioner that the plaintiff's knee injury was compensable because the medical reports on which the commissioner relied did not constitute competent evidence. Id.,

680–81. Judge Mihalakos dissented from that portion of the decision. Id., 686. Accordingly, the Appellate Court reversed the decision of the board with respect to its finding that the plaintiff's knee injury was compensable, but affirmed it in all other respects. Id. This certified, consolidated appeal followed. Additional facts and procedural history will be set forth as necessary.

"As a threshold matter, we set forth the standard of review applicable to workers' compensation appeals. The principles that govern our standard of review in workers' compensation appeals are well established. The conclusions drawn by [the commissioner] from the facts found must stand unless they result from an incorrect application of the law to the subordinate facts or from an inference illegally or unreasonably drawn from them. . . . It is well established that [a]lthough not dispositive, we accord great weight to the construction given to the workers' compensation statutes by the commissioner and [the] board. . . . A state agency is not entitled, however, to special deference when its determination of a question of law has not previously been subject to judicial scrutiny." (Internal quotation marks omitted.) *Deschenes* v. *Transco, Inc.*, 288 Conn. 303, 311, 953 A.2d 13 (2008); *Coppola* v. *Logistec Connecticut, Inc.*, 283 Conn. 1, 5–6, 925 A.2d 257 (2007); *Tracy* v. *Scherwitzky Gutter Co.*, 279 Conn. 265, 272, 901 A.2d 1176 (2006) ("[n]either the . . . board nor this court has the power to retry facts" [internal quotation marks omitted]); *Gartrell* v. *Dept. of Correction*, 259 Conn. 29, 36, 787 A.2d 541 (2002) ("[t]he commissioner has the power and duty, as the trier of fact, to determine the facts" [internal quotation marks omitted]).

I

In their appeal, the defendants claim that the Appellate Court improperly concluded that the plaintiff was entitled to total incapacity benefits under § 31-307

despite having entered into a voluntary agreement for the payment of permanent partial disability benefits under § 31-308 (b).[5] Specifically, the defendants assert that the workers' compensation statutory scheme creates a progression in which the claimant "numerically progresses by statute number" from temporary total incapacity to temporary partial disability to maximum medical improvement. The defendants further claim that because the plaintiff had progressed along the statutory time line to maximum medical improvement and entered into a voluntary agreement to receive permanent partial disability benefits, she was not entitled to temporary total incapacity benefits because she did not formally file a motion to open or modify her award under General Statutes § 31-315.[6] In response, the plain-

---

[5] General Statutes § 31-308 (b) provides in relevant part: "With respect to the following injuries, the compensation, in addition to the usual compensation for total incapacity but in lieu of all other payments for compensation, shall be seventy-five per cent of the average weekly earnings of the injured employee, calculated pursuant to section 31-310, after such earnings have been reduced by any deduction for federal or state taxes, or both, and for the federal Insurance Contributions Act made from such employee's total wages received during the period of calculation of the employee's average weekly wage pursuant to said section 31-310, but in no case more than one hundred per cent, raised to the next even dollar, of the average weekly earnings of production and related workers in manufacturing in the state, as determined in accordance with the provisions of section 31-309, or less than fifty dollars weekly. All of the following injuries include the loss of the member or organ and the complete and permanent loss of use of the member or organ referred to:

| "MEMBER | INJURY | WEEKS OF COMPENSATION |
|---|---|---|
| "Arm | | |
| "Master arm | Loss at or above elbow | 208 . . . ." |

We note that § 31-308 (b) was amended after the time of the plaintiff's claim by the addition of injuries to other parts of the body. See Public Acts 2000, No. 00-8. Those amendments are not relevant to this appeal and for purposes of convenience, we refer herein to the current revision of the statute.

[6] General Statutes § 31-315 provides: "Any award of, or voluntary agreement concerning, compensation made under the provisions of this chapter or any transfer of liability for a claim to the Second Injury Fund

tiff asserts that the Appellate Court properly concluded that she was entitled to temporary total incapacity benefits even after receiving permanent partial disability benefits pursuant to the voluntary agreement. Specifically, the plaintiff claims that the workers' compensation statutory scheme does not contain a strict progression and that the remedial nature of the statutory scheme militates against strict construction of the act. The plaintiff further asserts that it is within the discretion of the commissioner to award total incapacity benefits to a claimant like herself even after the claimant enters into a voluntary agreement to receive permanent partial disability without the claimant formally filing a motion to open the award. We agree with the plaintiff.

The defendants' appeal raises an issue of statutory interpretation, over which we exercise plenary review. See, e.g., *Considine* v. *Waterbury*, 279 Conn. 830, 836, 905 A.2d 70 (2006). "When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether

under the provisions of section 31-349 shall be subject to modification in accordance with the procedure for original determinations, upon the request of either party or, in the case of a transfer under section 31-349, upon request of the custodian of the Second Injury Fund, whenever it appears to the compensation commissioner, after notice and hearing thereon, that the incapacity of an injured employee has increased, decreased or ceased, or that the measure of dependence on account of which the compensation is paid has changed, or that changed conditions of fact have arisen which necessitate a change of such agreement, award or transfer in order properly to carry out the spirit of this chapter. The commissioner shall also have the same power to open and modify an award as any court of the state has to open and modify a judgment of such court. The compensation commissioner shall retain jurisdiction over claims for compensation, awards and voluntary agreements, for any proper action thereon, during the whole compensation period applicable to the injury in question."

the language actually does apply. . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter . . . ." (Internal quotation marks omitted.) Id., 836–37.

We begin with the language of the relevant provisions of the act. Section 31-307 (a) provides in relevant part that "[i]f any injury for which compensation is provided under the provisions of this chapter results in total incapacity to work, the injured employee shall be paid a weekly compensation equal to seventy-five per cent of the injured employee's average weekly earnings as of the date of the injury . . . ." Section 31-308 (b) provides in relevant part: "With respect to the following injuries, the compensation, in addition to the usual compensation for total incapacity but in lieu of all other payments for compensation, shall be seventy-five per cent of the average weekly earnings of the injured employee . . . . All of the following injuries include the loss of the member or organ and the complete and permanent loss of use of the member or organ referred to . . . ." In chart form, § 31-308 (b) then lists the compensable injuries to individual body parts, including the arm, and specifically the master arm, with the loss at or above the elbow entitling a claimant to 208 weeks of compensation. Section 31-315 further provides in relevant part: "Any award of, or voluntary agreement

concerning, compensation made under the provisions of this chapter . . . shall be subject to modification in accordance with the procedure for original determinations, upon the request of either party . . . whenever it appears to the compensation commissioner, after notice and hearing thereon, that the incapacity of an injured employee has increased, decreased or ceased, or that the measure of dependence on account of which the compensation is paid has changed, or that changed conditions of fact have arisen which necessitate a change of such agreement, award or transfer in order properly to carry out the spirit of this chapter. The commissioner shall also have the same power to open and modify an award as any court of the state has to open and modify a judgment of such court. The compensation commissioner shall retain jurisdiction over claims for compensation, awards and voluntary agreements, for any proper action thereon, during the whole compensation period applicable to the injury in question."

On appeal, the defendants assert that the plain language of § 31-308 (b), which provides that compensation under that section is "in addition to the usual compensation for total incapacity but in lieu of all other payments for compensation" indicates that once a claimant receives permanent partial disability benefits he or she is not eligible for any other benefits.[7] The plaintiff responds that this court previously has concluded that a claimant can receive total incapacity benefits after having received permanent partial disability benefits and nothing in the present case requires a departure from this precedent. We agree with the plaintiff, and conclude that in interpreting the language and interrelationship of §§ 31-307, 31-308 (b) and 31-315, we do not write on a clean slate, but are bound by our previous judicial interpretations of this language and

[7] See footnote 3 of this opinion.

the statutory scheme. See *Hummel* v. *Marten Transport, Ltd.*, 282 Conn. 477, 501, 923 A.2d 657 (2007) (holding that § 1-2z does not require this court to overrule prior judicial interpretations of statutes, even if not based on plain meaning rule).

Over the course of the last 100 years, this court frequently has interpreted the provisions of our workers' compensation statutory scheme by looking at the purpose and the legislative history of the act. At the outset, it is important to understand that the act provides for two unique categories of benefits—those designed to compensate for loss of earning capacity and those awarded to compensate for the loss, or loss of use, of a body part. See *Rayhall* v. *Akim Co.*, 263 Conn. 328, 349–51, 819 A.2d 803 (2003); see also 4 A. Larson & L. Larson, Workers' Compensation Law (2009) § 80.04, p. 80-13. "Total or partial incapacity benefits fall into the first category. See General Statutes §§ 31-307 and 31-308 (a). Disability benefits, also referred to as specific indemnity awards or permanency awards, fall into the second category." *Pizzuto* v. *Commissioner of Mental Retardation*, 283 Conn. 257, 267, 927 A.2d 811 (2007).

With this distinction in mind, we turn to our previous cases interpreting the language of § 31-308 (b). We first examine the case of *Costello* v. *Seamless Rubber Co.*, 99 Conn. 545, 122 A. 79 (1923). In *Costello*, the plaintiff suffered an injury that caused, inter alia, the amputation of two phalanges and the greater part of the third phalanx of the second finger of the right hand. Id., 547. The plaintiff was awarded total incapacity benefits related to this injury for the period of August 13, 1920, to November 10, 1920. Id. Starting November 10, 1920, the plaintiff was awarded permanent partial disability benefits for the loss of use of the second finger. Id., 546. After the original amputation, there remained a portion of the bone of the proximal phalanx, which caused the plaintiff pain and made him unable to do

full work until May 9, 1922, when he had a second operation for the removal of this piece of bone from the second finger. Id. As a result of this condition, the commissioner awarded the plaintiff partial incapacity from January 24, 1921, to May 9, 1922. Id. The defendants appealed to this court from the judgment of the trial court affirming the commissioner's award for the second period of incapacity, claiming that the statute excluded any allowance for partial incapacity due to the loss of a second finger except that specifically provided for in General Statutes (1918 Rev.) § 5352, as amended by chapter 142, § 7, of the 1919 Public Acts, the predecessor to § 31-308. Id., 547–48.

In considering the defendants' claim in *Costello*, this court examined the history of the act. "Prior to 1919 [§ 5352] read: 'In case of the following injuries the compensation, in lieu of all other payments [for compensation], shall be half of the average weekly earnings of the injured employee, prior to such injury for the terms respectively indicated.' While the statute was in this form the case of *Kramer* v. *Sargent & Co.*, 93 Conn. 26, 104 Atl. 490 [1918], came to this court. In that case the claimant was injured, and lost, by amputation on the same day, the terminal phalanx of one finger, and received one award for the loss of a phalanx and another award for total incapacity resulting from such loss. We held in that case that the phrase 'in lieu of all other payments' for compensation excluded all other payments than that specified in the schedule on account of the loss of the member and the handicap of the future through such loss. In the case of *Franko* v. *Schollhorn Co.*, 93 Conn. 13, 104 Atl. 485 [1918], decided on the same day, the claimant suffered an injury to a finger, which was followed by a period of total incapacity preceding its final loss by amputation, and for the total incapacity during the period of the unsuccessful attempt to save the finger, we held that the claimant

was entitled to compensation in addition to the specific compensation for its subsequent loss by amputation. The effect of these two decisions was that § 5352 was held not to exclude additional compensation for incapacity preceding the loss of a member, but to exclude additional compensation for subsequent incapacity caused by such loss. And since the *Kramer* case did not present any other question, it would be more accurate to say that § 5352 was held to exclude additional compensation for subsequent incapacity normally due to such loss.

"In *Saddlemire* v. *American Bridge Co.*, 94 Conn. 618, 110 Atl. 63 [1920], the claimant suffered an injury resulting in the loss by amputation of his right leg, and either as a result of the original injury to the right leg, or from infection following its amputation, a phlebitis developed in the left leg, causing a partial incapacity quite distinct from and additional to the partial incapacity due to the loss of the right leg. The finding did not make it clear whether the phlebitis resulted from the original injury or from the amputation, and the defendant contended that in the latter case it was a direct consequence of the loss of the leg, and no additional compensation could be awarded in excess of the specific compensation for the loss of the leg. On this point we said: 'Compensation for the loss of a leg includes the loss of earning power during the cure, and such damages as are the ordinary and immediate incidents of such a loss. But where, in consequence of the amputation, injuries result which are distinguishable from those immediate results of the amputated limb, for example, if a nervous disorder ensue, or blood poisoning set in, or a phlebitis develops, affections such as these were not intended by the [act] to be compensated in the loss of this member. They are not the normal and immediate incidents of the lost member. We pointed out in *Kramer* v. *Sargent & Co.*, [supra, 93 Conn. 28], that

the injuries specified in [§ 5352] . . . for the loss of a member, will ordinarily involve a period of incapacity of varying duration.' " *Costello* v. *Seamless Rubber Co.*, supra, 99 Conn. 548–49.

Relying on *Saddlemire*, this court in *Costello* clarified that "[a]ll of the injuries resulting from the loss of the member include those ordinary, natural and immediate results of the loss of the member. When the results are unusual, and are not the ordinary incidents following the amputation, and partial or total incapacity results, this is not to be attributed to the loss of the member, and is specifically included in the cases which [General Statutes (1918 Rev.) § 5355, the predecessor to § 31-315] provides shall authorize a modification of the original award." (Internal quotation marks omitted.) Id., 549–50.

In *Costello*, the defendants unsuccessfully attempted to distinguish the *Saddlemire* case "on the ground that the unusual condition creating an additional partial incapacity was . . . confined to the stump of the amputated finger and did not extend into the hand or into another finger." Id., 550. This court rejected this claim, holding that "no distinction based on the mere location of the abnormal condition can be sustained." Id. This court further concluded that, "[c]ompensation is awarded for incapacity, measured, with more or less accuracy, by loss of earning power, and the point of statutory construction involved is, as the *Saddlemire* case distinctly holds, whether or not the incapacity in question is one which can fairly be said to be a contemplated consequence of 'the loss of, or the complete and permanent loss of the use of,' the particular member involved." Id.

This court further relied on the fact that *Kramer* and *Franko* were decided prior to the 1919 amendment of § 5352, which added the words "in addition to the usual compensation for total incapacity . . . ." Public Acts

1919, c. 142, § 7. This court concluded that "[t]his addi-
tion, so far as it affects the prior construction of the
section, provides a more liberal measure of compensa-
tion because it obliterates the distinction theretofore
drawn between total incapacity preceding and follow-
ing the loss, and thereby reverses the ruling in the
*Kramer* case. The award in the *Saddlemire* case was
made before the amendment, but the reasoning of that
opinion is not affected thereby." *Costello* v. *Seamless
Rubber Co.*, supra, 99 Conn. 550–51.

In 1940, this court reaffirmed the holding in *Costello*,
concluding that "[w]here, as here, there is disability
followed by specific indemnity and subsequent disabil-
ity the question always is whether the final disability
is distinct from and due to a condition which is not a
normal and immediate incident of the loss." *Morgan* v.
*Adams*, 127 Conn. 294, 296, 16 A.2d 576 (1940); see id.
(concluding that plaintiff was entitled to total incapacity
benefits for second period of incapacity during which
plaintiff experienced further trouble with eye and had
it removed). This court distinguished cases in which
the final disability was "not only traceable to the original
injury but was due to a condition which was a normal
and immediate incident of the loss. Compensation was
accordingly denied. In the *Costello* case the contrary
was true and compensation was awarded . . . ." Id.

In *Morgan*, the disability award was for the "loss of
sight in one eye" under General Statutes (1930 Rev.)
§ 5237, also a predecessor to § 31-308 (a). This court
reasoned that "[t]he statute specifically refers to the
loss of sight, not to the loss of the eye. That aside, it
is common knowledge that the loss of sight does not
necessarily or even usually involve the loss of the eye.
While the commissioner did not find in so many words
that the loss of the eye was not a normal incident of
the loss of sight, he did find a changed condition of
fact requiring medical attention and resulting in disabil-

ity." Id. On the basis of that finding of a changed condition, this court concluded that the plaintiff's claim in *Morgan* was consistent with the ruling in *Costello* and that the plaintiff's final disability was compensable. Id.; see also *Osterlund v. State*, 135 Conn. 498, 506–507, 66 A.2d 363 (1949) (concluding that claimant, who previously had been paid temporary partial and permanent partial disability benefits, would be eligible for award of additional temporary total incapacity benefits if he demonstrated that he was unemployable).

In the eighty-seven years since the decision in *Costello v. Seamless Rubber Co.*, supra, 99 Conn. 545, the legislature has not amended the statute for total incapacity benefits to preclude a claimant from recovering incapacity benefits for a subsequent disability if it is distinct from and due to a condition that is not a normal and immediate incident of the loss for which the claimant received disability benefits for loss of use. Although legislative silence is not always indicative of legislative affirmation, we have routinely considered legislative inaction for a significant period of time to be significant. See *Hummel v. Marten Transport, Ltd.*, supra, 282 Conn. 502 (legislature's failure to act in eighteen years since court first interpreted statute "highly significant"); id., 494–95 ("[o]nce an appropriate interval to permit legislative reconsideration has passed without corrective legislative action, the inference of legislative acquiescence places a significant jurisprudential limitation on [this court's] authority to reconsider the merits of [its] earlier decision" [internal quotation marks omitted]); *Hammond v. Commissioner of Correction*, 259 Conn. 855, 873–74, 792 A.2d 774 (2002) (rejecting argument regardless of its merits because court constrained by more than sixteen years of legislative silence); *Rivera v. Commissioner of Correction*, 254 Conn. 214, 252, 756 A.2d 1264 (2000) (six years of legislative silence indicative of legislature's affirmation). Accordingly, we

conclude that a claimant is not precluded from receiving total incapacity benefits under § 31-307 for a subsequent disability if it is distinct from and due to a condition that is not a normal and immediate incident of the loss for which she received permanent partial disability benefits under § 31-308 (b).[8]

In the present case, at the hearing on her application for total disability benefits, the plaintiff presented evidence that demonstrated that she was totally incapacitated due to conditions that were not a normal or immediate incident of the partial loss of use of her right arm. Specifically, the plaintiff presented evidence from Beck, her treating physician. Beck opined in a deposition, as noted in the commissioner's findings, that the plaintiff "suffered from complete regional pain syndromes and reflex sympathetic dystrophy, which had developed over time" and that her "condition was myofascial pain and ongoing sympathetic fiber pain based on continued lost range of motion, sensitivity to touch and swelling of forearm and wrist." Beck also testified in the deposition that he doubted that the plaintiff

---

[8] We disagree with the concurring opinion, which states that the defendants clearly concede in their brief that if the plaintiff demonstrated a change in condition, then § 31-307 benefits are allowed. Although we acknowledge that the defendants concede that the plaintiff "was not without remedy for some change in her physical condition after accepting permanent partial [disability benefits]" and that she could have filed a motion for modification under § 31-315, the defendants *never* concede that she would be entitled to *§ 31-307 benefits* if she demonstrated such a change and such concession would be wholly inconsistent with their principal claim in this matter. We understand that the defendants are raising one principal claim, namely, that the plaintiff cannot receive total incapacity benefits under § 31-307 after entering into a voluntary agreement for the payment of permanent partial disability benefits under § 31-308 (b). We therefore rely on *Costello* v. *Seamless Rubber Co.*, supra, 99 Conn. 545, and its progeny to address under what circumstances a claimant is entitled to receive total incapacity benefits after receiving permanent partial disability benefits, and do not address whether, "*in the absence of a changed condition,* a claimant is entitled to receive total incapacity benefits after receiving permanent partial disability benefits." (Emphasis altered.)

"could hold a job . . . ." The plaintiff also presented evidence from Andrew Caputo, a surgeon who had performed a prior surgery on her right arm, which indicated that in May, 2004, she had a fracture line at the proximal aspect of the stem and posterior interosseous nerve[9] paresthesia.[10] Caputo recommended "repeat" X rays and indicated that an additional surgery might be necessary in the future to alleviate that condition. The plaintiff also introduced evidence from Albert Sabella, an expert in the field of vocational evaluation. Sabella testified that the plaintiff would not be able to meet the requirements of her previous job as a pharmacy technician and that she did not have transferable skills from that job because of the limited use of her right arm. Sabella concluded that it was not reasonable for the plaintiff to pursue any type of employment because of her lack of physical ability in her right arm, her absence from the workforce for approximately three years, her chronic pain in her master arm and the fact that she was still receiving medical treatment. On the basis of the foregoing evidence, the commissioner found that the plaintiff was totally incapacitated and was entitled to benefits under § 31-307. Although the commissioner did not explicitly find that the pain and ongoing medical issues that the plaintiff was enduring were not a normal incident of the partial loss of use of the right arm, it is implicit that the partial loss of use of the arm does not necessarily or even usually involve the complications from which the plaintiff suffered.[11] Accordingly, we con-

[9] The posterior interosseous nerve is "the terminal portion of the deep branch of the radial [nerve] . . . ." Stedman's Medical Dictionary (28th Ed. 2006).

[10] Paresthesia is "[a] spontaneous abnormal usually nonpainful sensation (e.g., burning, pricking) . . . ." Stedman's Medical Dictionary (28th Ed. 2006).

[11] As we explain more fully in part II of this opinion, the commissioner also determined that the plaintiff's injury to her right knee was compensable. Because we conclude in part II that the commissioner properly determined that the right knee injury was compensable and that the knee injury is distinct from and due to a condition that is not a normal and immediate

clude that the Appellate Court properly determined that the plaintiff was entitled to total incapacity benefits.

The defendants further claim that the plaintiff's failure to file a motion to open or modify pursuant to § 31-315 precludes her from receiving total incapacity benefits pursuant to § 31-307. Section 31-315 provides in relevant part: "Any award of, or voluntary agreement concerning, compensation made under the provisions of this chapter . . . shall be subject to modification in accordance with the procedure for original determinations, upon the request of either party . . . whenever it appears to the compensation commissioner, after notice and hearing thereon, that the incapacity of an injured employee has increased, decreased or ceased, or that the measure of dependence on account of which the compensation is paid has changed, or that changed conditions of fact have arisen which necessitate a change of such agreement, award or transfer in order properly to carry out the spirit of this chapter. The commissioner shall also have the same power to open and modify an award as any court of the state has to open and modify a judgment of such court. The compensation commissioner shall retain jurisdiction over claims for compensation, awards and voluntary agreements, for any proper action thereon, during the whole compensation period applicable to the injury in question." This court has recognized that a modification of an award pursuant to § 31-315 is the appropriate means of obtaining total incapacity benefits in a situation in which a claimant suffers a subsequent disability. See *Costello* v. *Seamless Rubber Co.*, supra, 99 Conn. 550 ("[w]hen the results are unusual, and are not the ordinary incidents following the [injury], and partial or total incapacity results, this is not to be attributed to

incident of the partial loss of the use of the plaintiff's right arm, we conclude that the right knee injury provides yet another basis on which the plaintiff was properly awarded total incapacity benefits.

the loss [of use] of the member, and is specifically included in the cases which [§ 31-315, formerly General Statutes (1918 Rev.) § 5355] provides shall authorize a modification of the original award" [internal quotation marks omitted]). Bearing in mind, however, the remedial purposes of the workers' compensation statutory scheme, we cannot conclude that the plaintiff's failure to file a formal motion to modify precludes her receipt of benefits under the act. See *Pizzuto* v. *Commissioner of Mental Retardation*, supra, 283 Conn. 265 ("[W]e are mindful that the act indisputably is a remedial statute that should be construed generously to accomplish its purpose. . . . The humanitarian and remedial purposes of the act counsel against an overly narrow construction that unduly limits eligibility for workers' compensation. . . . Accordingly, [i]n construing workers' compensation law, we must resolve statutory ambiguities or lacunae in a manner that will further the remedial purpose of the act. . . . [T]he purposes of the act itself are best served by allowing the remedial legislation a reasonable sphere of operation considering those purposes." [Citations omitted; internal quotation marks omitted.]).

First, in the present case, the record demonstrates that the commissioner and the parties considered the plaintiff's application for total incapacity benefits to be the equivalent of a motion to open or modify pursuant to § 31-315. Indeed, as we have explained previously herein, the commissioner's determination that the plaintiff was entitled to total incapacity benefits was based on a finding that her condition had changed since she entered into the voluntary agreement. In considering the plaintiff's request for total incapacity benefits, the commissioner, therefore applied the standard applicable to a § 31-315 motion. Second, the defendants have failed to point to any way in which the plaintiff's failure to file a formal motion to open or modify pursuant to

§ 31-315 prejudiced them. Indeed, at the hearing the defendants never objected to the plaintiff's failure to file a motion under § 31-315, were given adequate notice of the hearing and were able to participate, present evidence, and cross-examine witnesses. Furthermore, the board considered the commissioner's award "as modifying the prior award based on [a] changed condition of fact under § 31-315."

Moreover, keeping in mind the purpose of the act, which is to be liberally construed to provide coverage for employees who are injured while working, we conclude that it would violate public policy to deny the plaintiff benefits on the basis of her failure to frame her application for total incapacity benefits as a motion to open or modify under § 31-315. *Dubois* v. *General Dynamics Corp.*, 222 Conn. 62, 67, 607 A.2d 431 (1992) ("[w]e are mindful of the principles underlying Connecticut practice in workmen's compensation cases: that the legislation is remedial in nature . . . and that it should be broadly construed to accomplish its humanitarian purpose" [citation omitted; internal quotation marks omitted]); *Massolini* v. *Driscoll*, 114 Conn. 546, 553, 159 A. 480 (1932) ("[t]he [act] is to be construed with sufficient liberality to carry into effect the beneficent purpose contemplated in that legislation, and not to defeat that purpose by narrow and technical definition"). Accordingly, we affirm the judgment of the Appellate Court affirming the board's conclusion that the plaintiff is entitled to total incapacity benefits under § 31-307.

II

In her cross appeal, the plaintiff claims that the Appellate Court majority improperly concluded that the commissioner should not have relied on a medical report from Santoro in determining that the plaintiff's knee injury was compensable. In support of her claim, the

plaintiff asserts that the issue of whether the plaintiff's arm injury was the proximate cause of her knee injury was a factual issue within the province of the commissioner. Moreover, the plaintiff further claims that Santoro's report constituted substantial and credible evidence on which the commissioner properly relied in finding that the plaintiff's arm injury was the proximate cause of her knee injury. In response, the defendants assert that the Appellate Court majority properly concluded that the commissioner improperly relied on Santoro's report because it was not supported by competent evidence on which the commissioner could rely. We agree with the plaintiff, and accordingly reverse the judgment of the Appellate Court as it relates to the plaintiff's knee injury.

At the hearing before the commissioner, the plaintiff sought to enter into evidence her medical records from Santoro. The records contained a note and a letter in which Santoro expressed his opinion that the plaintiff's knee injury was causally related to the arm injury. The note, dated November 28, 2000, stated: "*I feel that there is [a] direct related cause of the knee injury to the right elbow pre-existing problem.*" (Emphasis added.) The letter, which also was authored by Santoro and was dated April 5, 2002, was written to the plaintiff's attorney and provided: "I am responding to your . . . correspondence regarding your client and my patient, [the plaintiff]. Please be advised that we have recommended surgery and this dates back to [February, 2002]. I talked specifically with the [plaintiff] that she had an osteochondral lesion [in her knee]. *This is a direct result of her previous work-related trauma and as such is a continuation of her ongoing problems. This does not represent a new condition.*" (Emphasis added.)

The defendants objected to the admission of the November, 2000 note on the ground that it was not a medical report in accordance with General Statutes

§ 52-174 (b).[12] Over the defendants' objection, the commissioner admitted the note into evidence. The defendants did not object, however, to the admission into evidence of the April 5, 2002 letter.[13] In his findings and award, the commissioner determined that "Santoro reported that there is [a] direct related cause of the [plaintiff's] knee injury to her right elbow preexisting

[12] Although § 52-174 (b) was amended after the proceedings before the commissioner in the present case; see Public Acts 2008, No. 08-81; those changes are not relevant to this appeal. For purposes of convenience, references herein to § 52-174 are to the current revision of the statute.

[13] On appeal to the Appellate Court, the defendants claimed that the report in which Santoro opined that the plaintiff's knee injury was causally related to her arm injury should not have been admitted into evidence because it was not a medical report for the purposes of § 52-174 (b). As we have explained previously in this opinion, there were two documents admitted into evidence by the commissioner that contained Santoro's opinion that the plaintiff's knee injury was causally related to the plaintiff's arm injury, namely, the November, 2000 note and the April, 2002 letter. The defendants did not object to the admission of the April, 2002 letter. The Appellate Court concluded, that because "[t]he defendants did not object to [the April, 2002] letter during the hearing . . . they can not raise the propriety of its admission into evidence for the first time on appeal." *Marandino* v. *Prometheus Pharmacy*, supra, 105 Conn. App. 675, citing *Lorthe* v. *Commissioner of Correction*, 103 Conn. App. 662, 699, 931 A.2d 348 ("[t]his court does not review claims raised for the first time on appeal"), cert. denied, 284 Conn. 939, 937 A.2d 696 (2007). The Appellate Court further concluded that, because the April, 2002 letter contained the same opinion of causation regarding the knee and arm injury as the November, 2000 note, the November, 2000 note was cumulative of the opinion contained in the April, 2002 letter. *Marandino* v. *Prometheus Pharmacy*, supra, 675–76. Therefore, the Appellate Court concluded that it was not necessary to reach the issue of whether the commissioner properly admitted the November, 2000 note because, "even if the November . . . 2000 note was admitted improperly, the commissioner could have relied on the April 5, 2002 letter for the very same proposition." Id., 676, citing *State* v. *Williams*, 30 Conn. App. 654, 656, 621 A.2d 1365 (1993) ("We do not reach the issue of whether the trial court's ruling was proper. . . . It is well established that a judgment need not be reversed merely because inadmissible evidence has been admitted, if permissible evidence to the same effect has also been placed before the jury." [Citations omitted.]); *State* v. *Farnum*, 275 Conn. 26, 31 n.4, 878 A.2d 1095 (2005) ("[i]n light of our conclusion that there was sufficient evidence to affirm the defendant's conviction in the absence of this evidence, we need not address this claim"). We agree with the Appellate Court.

problem" and further found that "[t]he opinion of . . . Santoro with respect to the cause of the [plaintiff's] injury to her right knee *being uncontradicted* is persuasive." (Emphasis added.)

On appeal to the Appellate Court, the defendants claimed that there was not sufficient evidence in the record on which the commissioner could rely to find that the plaintiff's knee injury was causally related to her arm injury. The Appellate Court majority agreed with the defendants and concluded that, "Santoro's reports provided a determination of causation without any supporting medical facts from which medical causation could reasonably be inferred. Because Santoro's opinion regarding causation is merely a statement devoid of a basis in fact . . . it was not competent evidence, but rather speculation and conjecture and, as such, could not, without more, be relied on to determine whether legal causation existed between the arm and [knee] injury." *Marandino* v. *Prometheus Pharmacy*, supra, 105 Conn. App. 680–81.[14]

As we have explained previously herein, "[t]he principles that govern our standard of review in workers' compensation appeals are well established. The conclusions drawn by [the commissioner] from the facts found must stand unless they result from an incorrect applica-

---

[14] Judge Mihalakos dissented from the majority opinion of the Appellate Court. *Marandino* v. *Prometheus Pharmacy*, supra, 105 Conn. App. 686. Noting that, "[w]hether Santoro's opinion was based on facts is a preliminary question of admissibility . . . [and that] [o]nce Santoro's report was properly received, the commissioner was entitled to rely on the conclusions set forth in the report if he found it credible." Id., 689 (*Mihalakos, J.*, dissenting). Judge Mihalakos further concluded: "I disagree with the majority's conclusion that Santoro's report was based on speculation and conjecture because it did not include any supporting medical facts. . . . The conclusion reached by Santoro was unequivocal . . . . There simply is no indication that his opinion was based on speculation or conjecture, rather than on a reasonable probability." (Citations omitted.) Id., 689–90. Accordingly, Judge Mihalakos would have affirmed the judgment of the board, affirming the factual determinations of the commissioner. Id., 693.

tion of the law to the subordinate facts or from an inference illegally or unreasonably drawn from them. . . . Neither the . . . board nor this court has the power to retry facts." (Citation omitted; internal quotation marks omitted.) *Tracy* v. *Scherwitzky Gutter Co.*, supra, 279 Conn. 272.

"To recover under the [act], an employee must meet the two part test embodied in General Statutes § 31-275,[15] namely, that the injury claimed arose out of the employee's employment and occurred in the course of the employment. . . . [I]n Connecticut traditional concepts of proximate cause constitute the rule for determining . . . causation [in a workers' compensation case]." (Citation omitted; internal quotation marks omitted.) *DiNuzzo* v. *Dan Perkins Chevrolet Geo, Inc.*, 294 Conn. 132, 141, 982 A.2d 157 (2009). "An actual cause that is a substantial factor in the resulting harm is a proximate cause of that harm. . . . The finding of actual cause is thus a requisite for any finding of proximate cause." (Internal quotation marks omitted.) *Winn* v. *Posades*, 281 Conn. 50, 57, 913 A.2d 407 (2007).

"When, as in the present case, it is unclear whether an employee's [subsequent injury] is causally related

[15] General Statutes § 31-275 provides in relevant part: "As used in this chapter, unless the context otherwise provides:

"(1) 'Arising out of and in the course of his employment' means an accidental injury happening to an employee or an occupational disease of an employee originating while the employee has been engaged in the line of the employee's duty in the business or affairs of the employer upon the employer's premises, or while engaged elsewhere upon the employer's business or affairs by the direction, express or implied, of the employer, provided . . . .

"(B) A personal injury shall not be deemed to arise out of the employment unless causally traceable to the employment other than through weakened resistance or lowered vitality . . . .

"(E) A personal injury shall not be deemed to arise out of the employment if the injury is sustained: (i) At the employee's place of abode, and (ii) while the employee is engaged in a preliminary act or acts in preparation for work unless such act or acts are undertaken at the express direction or request of the employer . . . ."

to a compensable injury, it is necessary to rely on expert medical opinion. See, e.g., *Murchison* v. *Skinner Precision Industries, Inc.*, 162 Conn. 142, 152, 291 A.2d 743 (1972). Unless the medical testimony by itself establishes a causal relation, or unless it establishes a causal relation when it is considered along with other evidence, the commissioner cannot reasonably conclude that the [subsequent injury] is causally related to the employee's employment. . . . Id. Expert opinions must be based [on] reasonable probabilities rather than mere speculation or conjecture if they are to be admissible in establishing causation. . . . To be reasonably probable, a conclusion must be more likely than not. . . . Whether an expert's testimony is expressed in terms of a reasonable probability that an event has occurred does not depend [on] the semantics of the expert or his use of any particular term or phrase, but rather, is determined by looking at the entire substance of the expert's testimony. . . . *Struckman* v. *Burns*, 205 Conn. 542, 554–55, 534 A.2d 888 (1987)." (Internal quotation marks omitted.) *DiNuzzo* v. *Dan Perkins Chevrolet Geo, Inc.*, supra, 294 Conn. 142–43.

In her cross appeal, the plaintiff claims that the Appellate Court majority improperly concluded that the commissioner's finding that her knee injury was compensable was not supported by competent medical evidence. To the contrary, the plaintiff asserts that the commissioner properly relied on the uncontroverted medical opinion of her attending physician. The plaintiff further claims that Santoro's report did not constitute speculation or conjecture merely because it did not contain the supporting medical facts for his conclusion regarding causation. We agree with the plaintiff.

This court has repeatedly stated that, a workers' compensation award must be based on competent evidence and that, in workers' compensation matters, "the opinions of experts [are] to be received and considered as in

other cases generally . . . ." (Internal quotation marks
omitted.) *Cooke* v. *United Aircraft Corp.*, 152 Conn.
214, 216, 205 A.2d 484 (1964). It is axiomatic that the
trier of fact has "wide discretion in ruling on the admis-
sibility of expert testimony and, unless that discretion
has been abused or the ruling involves a clear miscon-
ception of the law, the trial court's decision will not be
disturbed." (Internal quotation marks omitted.) *Sulli-
van* v. *Metro-North Commuter Railroad Co.*, 292 Conn.
150, 157, 971 A.2d 676 (2009). "The essential facts on
which an expert opinion is based are an important con-
sideration in determining the admissibility of his opin-
ion." *State* v. *Douglas*, 203 Conn. 445, 452, 525 A.2d 101
(1987). "In order to render an expert opinion the witness
must be qualified to do so and there must be a factual
basis for the opinion. . . . Some facts must be shown
as the foundation for an expert's opinion, but there is
no rule of law declaring the precise facts which must
be proved before such an opinion may be received in
evidence." (Citations omitted; internal quotation marks
omitted.) *State* v. *John*, 210 Conn. 652, 677, 557 A.2d
93, cert. denied, 493 U.S. 824, 110 S. Ct. 84, 107 L. Ed.
2d 50 (1989).

In the present case, the plaintiff presented evidence
from Santoro in which he definitively stated that it was
his medical opinion that the plaintiff's knee injury was
causally related to her arm injury. As we have explained
previously herein, the defendants did not object to the
admission of the medical report of Santoro being admit-
ted into evidence. See footnote 13 of this opinion. At
the hearing, the defendants did not challenge Santoro's
qualifications as an expert witness; nor did they offer
any contrary report or witness. Indeed, the evidence at
the hearing established that Santoro was the plaintiff's
attending physician who had treated her for approxi-
mately two years and performed two surgeries on her
knee. Accordingly, it is undisputed that Santoro was

qualified to provide an expert opinion in this matter. Compare *Cooke* v. *United Aircraft Corp.*, supra, 152 Conn. 216 ("[in workers' compensation matters] the opinions of experts [are] to be received and considered as in other cases generally but . . . the opinion of a physician which is based wholly or partly on statements and symptoms related to the physician by the patient on a personal examination is inadmissible where the examination was made for the purpose of qualifying the physician to testify as a medical expert" [internal quotation marks omitted]).

Instead, on appeal the defendants claimed and the Appellate Court majority agreed that Santoro's expert opinion was not competent because he failed to include the supporting medical facts behind his conclusion in his medical report. We disagree. As we have explained previously herein, the facts on which an expert relies for his medical opinion is relevant to determining the admissibility of the expert opinion, but once determined to be admissible, there is no rule establishing what precise facts must be included to support an expert opinion. See *State* v. *Douglas*, supra, 203 Conn. 452; see also *State* v. *John*, supra, 210 Conn. 677. Once Santoro's report was admitted into evidence, the trier of fact— the commissioner—was free to determine the weight to be afforded to that evidence. *Wasniewski* v. *Quick & Reilly, Inc.*, 292 Conn. 98, 103, 971 A.2d 8 (2009) ("[t]he credibility of the witnesses and the weight to be accorded to their testimony is for the trier of fact" [internal quotation marks omitted]). If the defendants sought to challenge the credibility or weight to be afforded to Santoro's expert opinion of causation they could have done so by deposing him prior to the hearing or calling him as a witness at the hearing. The defendants did neither. Accordingly, we cannot conclude that the commissioner's reliance on the unequivocal expert opinion of Santoro was not reasonable.

Moreover, as we have explained previously herein, it is proper to consider medical evidence *along with all other evidence* to determine whether an injury is related to the employment. *Murchison* v. *Skinner Precision Industries, Inc.*, supra, 162 Conn. 151. In the present case, the plaintiff personally testified that on January 1, 2000, while in the basement of her home, she heard the telephone ring. As the plaintiff began to climb the stairs hurriedly to answer the telephone, she felt herself fall backward. Because of the injury to her right arm, she did not grab the handrail with that arm, but instead twisted around and grabbed the handrail with her left arm. The plaintiff further testified that when she did so, she gave herself "quite a tug . . . twisted [her] knee . . . [and] felt a crunch." The Appellate Court majority concluded that "[t]here is nothing in Santoro's reports, or in the record, to suggest that the arm injury, rather than some other source, was a substantial factor in bringing about the knee injury." *Marandino* v. *Prometheus Pharmacy*, supra, 105 Conn. App. 680. We disagree and conclude that the plaintiff's own testimony corroborated Santoro's medical opinion. Accordingly, we conclude that the commissioner properly determined that the knee injury was causally related to the plaintiff's employment based on the expert opinion of Santoro when considered along with the other evidence.

The defendants claim that this appeal is controlled by our recent case, *DiNuzzo* v. *Dan Perkins Chevrolet Geo, Inc.*, supra, 294 Conn. 132. We disagree. In *DiNuzzo*, we affirmed the conclusion of the Appellate Court that the commissioner improperly relied on the opinion of the plaintiff's medical expert because there was not a proper factual basis in the record for the expert's opinion. Id., 144. In *DiNuzzo*, the plaintiff's expert testified that the decedent's death was caused by arthesclerotic disease, which was causally related

to his previous compensable spinal injury because the prior injury had severely limited his ability to maintain his physical fitness and aerobic conditioning. Id., 135. The evidence before the commissioner established, however, that the plaintiff's expert had not examined the decedent's body, that he did not know if the decedent had a congenital heart defect that would have caused the heart attack, and that no autopsy had been performed. Id., 138. Indeed, the plaintiff's expert conceded that it was impossible to know the exact cause of the decedent's death and that a number of other factors could have caused a sudden death. Id. On the basis of that record, we concluded that it was unreasonable for the commissioner to have relied on the opinion of the plaintiff's expert to award the plaintiff a claim for dependent widow's benefits pursuant to the act. Id., 147–48.

The expert opinion evidence in the present case is readily distinguishable from that in *DiNuzzo*. First, as we have explained previously herein, Santoro was the plaintiff's attending physician who had treated her for approximately two years after she had received the injury for which she sought compensation. Unlike the medical expert in *DiNuzzo*, Santoro had performed multiple physical examinations of the plaintiff's injured knee, as well as reviewing other diagnostic reports, such as a magnetic resonance imaging report. Second, unlike the expert in *DiNuzzo*, Santoro was able to state with medical certainty that the plaintiff's knee injury was causally related to her arm injury. There is no evidence in the record to indicate that Santoro was not certain of this causal relationship. See *Aspiazu* v. *Orgera*, 205 Conn. 623, 632, 535 A.2d 338 (1987) ("An expert opinion cannot be based on conjecture or surmise but must be reasonably probable. . . . Any expert opinion that describes a condition as possible or merely fifty-fifty is based on pure speculation." [Citation omitted; internal quotation marks omitted.]). Accordingly,

Santoro's expert opinion is outside the realm of speculation and the commissioner reasonably relied on it in reaching his decision.

The judgment of the Appellate Court is affirmed with respect to the defendants' appeal challenging the award of total incapacity benefits to the plaintiff; the judgment of the Appellate Court is reversed with respect to the plaintiff's cross appeal regarding the compensability of her knee injury and the case is remanded to that court with direction to affirm the compensation review board's decision.

In this opinion NORCOTT and McLACHLAN, Js., concurred.

KATZ, J., with whom, ROGERS, C. J., joins, concurring. I agree with the majority that the Appellate Court: (1) properly affirmed in part the decision of the workers' compensation review board (board) dismissing the appeal of the defendants, Prometheus Pharmacy and CNA RSKCo Services, from the decision of the workers' compensation commissioner (commissioner) concluding that the plaintiff, Susan Marandino, is entitled to total incapacity benefits; and (2) improperly reversed in part the board's decision insofar as it had dismissed the defendants' appeal from the commissioner's decision finding the plaintiff's knee injury compensable. I disagree, however, with the majority's analysis with respect to the first issue. Specifically, that issue requires the court to consider under what circumstances a claimant who has received permanent partial disability benefits under General Statutes § 31-308 (b) pursuant to a voluntary agreement subsequently may obtain total incapacity benefits under General Statutes § 31-307.[1]

---

[1] Although both §§ 31-308 and 31-307 have been amended since the time of the relevant proceedings in the present case; see Public Acts 2006, No. 06-84; Public Acts 2000, No. 00-8; those changes are not relevant to this appeal and I, like the majority, refer herein to the current revision of those statutes for purposes of convenience.

Although I agree with the majority that the plaintiff is entitled to total incapacity benefits, I would resolve the issue on a narrower basis than the majority does. Specifically, I would conclude only that the Appellate Court properly determined that the board properly had dismissed the defendants' appeal on the ground that the plaintiff's deteriorating condition since the execution of the voluntary agreement constituted a changed condition of fact that permitted modification of the agreement under General Statutes § 31-315.[2]

To explain my concerns and the more limited approach that I would take, I begin with a brief summary of the underlying proceedings and the parties' claims on appeal to this court. It is undisputed that, in 2002, following the plaintiff's third surgery in March, 2001, the parties executed a voluntary agreement under which the plaintiff received permanent incapacity benefits under § 31-308 (b) for a 41 percent permanent partial impairment to her right master arm. Sometime before February, 2004, when the formal proceedings in this case commenced, the plaintiff filed a claim seeking total incapacity benefits.[3] She did not file a formal motion to open or modify the agreement.

---

[2] General Statutes § 31-315 provides in relevant part: "Any award of, or voluntary agreement concerning, compensation made under the provisions of this chapter . . . shall be subject to modification in accordance with the procedure for original determinations, upon the request of either party . . . whenever it appears to the compensation commissioner, after notice and hearing thereon, that the incapacity of an injured employee has increased, decreased or ceased, or that the measure of dependence on account of which the compensation is paid has changed, or that changed conditions of fact have arisen which necessitate a change of such agreement, award or transfer in order properly to carry out the spirit of this chapter. The commissioner shall also have the same power to open and modify an award as any court of the state has to open and modify a judgment of such court. The compensation commissioner shall retain jurisdiction over claims for compensation, awards and voluntary agreements, for any proper action thereon, during the whole compensation period applicable to the injury in question."

[3] Although the parties agree on these background facts, neither the plaintiff's request for the total incapacity benefits nor the voluntary agreement

In his finding and award, the commissioner con-
cluded that the plaintiff was totally incapacitated and,
therefore, was entitled to benefits under § 31-307. In
support of the incapacity determination, the commis-
sioner found credible testimony and evidence relating
to the plaintiff's 41 percent permanent partial disability
to her arm, her chronic and debilitating pain and her
long-term use of narcotic medication to treat that pain.
Thereafter, the defendants filed a motion to correct the
finding and award seeking to add or substitute, inter
alia, the following findings: (1) the parties had executed
a voluntary agreement on April 24, 2002, for payment
of permanent partial disability benefits, which the com-
missioner subsequently approved; (2) the plaintiff had
offered no medical evidence of a change in her medical
condition after April 24, 2002; (3) the plaintiff had not
moved to open the voluntary agreement pursuant to
§ 31-315; and (4) "[t]he [plaintiff's] only entitlement
[after accepting the permanent disability benefits] is for
benefits payable due to a relapse pursuant to [General
Statutes] § 31-307b, benefits for additional permanent
partial disability pursuant to [General Statutes] § 31-
308a or subject to [a] motion to modify the voluntary
agreement pursuant to . . . § 31-315." The commis-
sioner denied the motion. The defendants did not seek
an articulation. See *Biehn* v. *Bridgeport*, No. 5232, CRB-
4-07-6 (September 11, 2008) ("a [m]otion for [a]rticula-
tion is a suitable remedy when the basis for the trial
commissioner's conclusions is unclear or the factual
findings as written are perceived to be ambiguous").

After the commissioner issued the final award, the
defendants appealed to the board, which dismissed the
appeal. The board determined that "[t]he presence of

were made part of the record before this court. In addition, although the
defendants suggest in their brief to this court that the plaintiff received
some incapacity benefits prior to the execution of the agreement, there is
no evidence in the record regarding the payment of such benefits.

a deteriorating condition is an essential jurisdictional fact to [an] award [of] § 31-307 benefits when they have not been ordered previously . . . ." The board therefore examined whether the plaintiff's failure to move formally to open the award under § 31-315 rendered the award ineffective and whether the plaintiff had proved a changed condition. The board first concluded that, because the defendants had notice of the change in benefits sought and the award of § 31-307 benefits was to commence upon exhaustion of the § 31-308 (b) benefits, the absence of a formal motion to open the award was inconsequential and did not render the award ineffective. The board next concluded that, in light of evidence credited by the commissioner that would support a finding that the plaintiff's condition had worsened since 2002, the board would construe the award as modifying the agreement on the basis of a changed condition of fact under § 31-315.

The defendants appealed from the board's decision to the Appellate Court. As set forth in the the Appellate Court opinion, the defendants claimed that, "because the plaintiff reached maximum medical improvement and entered into a voluntary agreement to receive permanent partial disability benefits, she [was] unable to request total incapacity benefits without demonstrating a change in medical condition since entering into the agreement." *Marandino* v. *Prometheus Pharmacy*, 105 Conn. App. 669, 681, 939 A.2d 591 (2008). The defendants contended that the plaintiff had not demonstrated a changed condition to allow a modification of the parties' agreement under § 31-315 and, therefore, the Workers' Compensation Act (act), General Statutes § 31-275 et seq., did not permit an award of incapacity benefits under § 31-307. Id., 682. The Appellate Court focused exclusively on the question of whether the record supported the board's conclusions that the plaintiff's condition had changed and that she had proved that she was

unemployable, affirming the judgment on that basis. Id., 682–86. Therefore, the court did not address the question of whether, in the absence of a changed condition, the act would have precluded the award of incapacity benefits.

In their certified appeal to this court, the defendants contend that the workers' compensation scheme sets forth a strict progression of benefits under which, once the plaintiff entered into a voluntary agreement to accept permanent partial disability benefits under § 31-308 (b), she could not receive total incapacity benefits under § 31-307 without moving to open and modify the agreement on the basis of a changed condition of fact under § 31-315.[4] They further contend that both the Appellate Court and the board improperly concluded that there was a changed condition of fact to warrant modifying the agreement to allow an award of total incapacity benefits because the plaintiff had not sought a modification of the agreement under § 31-315 and because the commissioner had made no express finding of a changed condition of fact. Accordingly, much of the defendants' brief to this court focuses on an issue that the Appellate Court did not address, namely, whether, *in the absence of a changed condition of fact,*

---

[4] Specifically, the defendants contend that, in the absence of a changed condition, the scheme requires a strict, one-way progression from total incapacity benefits under § 31-307, to partial incapacity benefits under § 31-308 (a), to permanent disability benefits under § 31-308 (b). They further contend that, upon exhaustion of permanent disability benefits and without a changed condition, the only additional benefits that would be available are the discretionary benefits under General Statutes § 31-308a.

The defendants acknowledge that, under our case law, the commissioner would have had discretion to award total incapacity benefits to the plaintiff if she had requested them at the time the commissioner approved the voluntary agreement for permanent partial disability benefits under § 31-308 (b). They contend, however, that, once the plaintiff executed the agreement without asking for total incapacity benefits, she could not thereafter obtain those benefits without modifying the agreement, which would require, according to the defendants, a change in her condition.

the workers' compensation scheme permits the commissioner to award total incapacity benefits after a claimant has accepted permanent disability benefits.[5]

The majority agrees with the plaintiff's two responses to these contentions: first, that the scheme does not mandate a strict progression of benefits that bars an award of total incapacity benefits after a claimant receives permanent partial disability benefits; and, second, that the Appellate Court properly concluded that the plaintiff's condition had changed since executing the voluntary agreement, thereby allowing modification of the agreement. As support for the first conclusion, the majority points to a line of cases from 1918 to 1940 on which it relies for the following proposition: "[A] claimant is not precluded from receiving incapacity benefits under § 31-307 for a subsequent disability if it is distinct from and due to a condition that is not a normal and immediate incident of the loss for which she received permanent partial disability benefits under § 31-308 (b)."

I have several concerns about the majority's approach. Fundamentally, it appears to me that either of the plaintiff's responses, if correct, would be an independent and sufficient basis on which to affirm the Appellate Court. The only reason that we would need to reach both grounds is if we were to conclude that the act generally does *not* permit a subsequent award of total incapacity benefits after a claimant has received

---

[5] Within the context of this claim, the defendants' brief discusses the evidentiary requirements for establishing total incapacity. It is unclear whether this discussion is intended to support the defendants' claim that the plaintiff had not demonstrated a changed condition or whether it is an attempt to renew a different claim that they had raised in the Appellate Court, namely, that the plaintiff also is not entitled to total incapacity benefits because she failed to demonstrate that she actively sought employment. As the latter contention is neither separately briefed nor addressed in the conclusion of the defendants' brief, I agree with the majority's determination not to treat this discussion as raising a separate claim.

permanent disability benefits. In that case, we would have to consider whether the plaintiff has met the conditions for modification of the voluntary agreement. Indeed, the board analyzed the question precisely in this manner. The Appellate Court implicitly assumed, *without deciding*, that the act would not permit the award in the absence of a changed condition and determined that such a condition had been established.

I would affirm the Appellate Court's judgment on the narrow basis of that court's decision for several reasons. First, the defendants repeatedly have conceded that a changed condition is a proper *legal* basis on which to modify a voluntary agreement for permanent disability benefits to allow a claimant subsequently to receive total incapacity benefits.[6] They simply dispute whether, *in the present case*, the procedural and substantive requirements to allow a modification of the agreement have been met. Second, although the plaintiff and the amicus curiae, the Connecticut Trial Lawyers Association, vigorously contest the defendants' contention that, after executing the voluntary agreement, the plaintiff would not be entitled to the incapacity benefits in the absence of a changed condition, they have cited no case law holding to the contrary. Indeed, the board's decision in the present case suggests that

---

[6] Examples of the defendants' concession as to this legal question include the following statements in their brief: "*Unless [the plaintiff] proves a change in her physical condition* (such as hospitalization for the injury) her only remedy to secure additional benefits is on the next stop of the statutory time line or [§] 31-308a." (Emphasis added.) "The [plaintiff] was not without remedy for some change in her physical condition after accepting permanent partial disabilit[y] [benefits] 'in lieu of all other compensation.' *The commissioner had continuing jurisdiction under § 31-315 to modify an award or voluntary agreement if there had been a change in her condition.* . . . An appropriate motion for modification could have been filed or a motion to [open] if the [plaintiff] had evidence to support such motions. . . . *Based upon the evidence, she did not have any change in her condition to support a motion to modify or a motion to [open]*." (Citations omitted; emphasis added.)

it agrees with the defendants' view of the statutory scheme.[7] Although our case law clearly supports the proposition that, at the time a claimant reaches maximum medical improvement, the commissioner has discretion whether to continue total incapacity benefits and hold in abeyance the award of permanent disability benefits; see *McCurdy* v. *State*, 227 Conn. 261, 268, 630 A.2d 64 (1993); *Osterlund* v. *State*, 129 Conn. 591, 597–600, 30 A.2d 393 (1943); it does not appear that our appellate courts directly have addressed the question posed by the defendants as to whether the failure to ask the commissioner to exercise his or her discretion at that point in time will bar a later award of incapacity benefits when there is no change in the claimant's condition. As I next explain, the case law cited by the majority does not address this question. Therefore, the question of whether the plaintiff would be entitled to total incapacity benefits in the absence of a changed condition

---

[7] I note that, in reaching its conclusion that a deteriorating condition was an essential jurisdictional fact in the present case, the board relied on cases addressing the question of whether the doctrine of collateral estoppel bars a request for total incapacity benefits after a previous *denial* of a request for such benefits. See *Bailey* v. *Stripling Auto Sales, Inc.*, No. 4516, CRB-2-02-4 (May 8, 2003), citing *Schreiber* v. *Town & Country Auto Services*, No. 4239, CRB-3-00-5 (June 15, 2001). In those cases, the board had concluded that a claim for a different period based on proof of a condition that had deteriorated since the prior denial would not be barred under that doctrine. The board did not explain in its decision in the present case why a *failure* to request incapacity benefits at the time a voluntary agreement for permanent disability benefits is approved is tantamount to a *denial* of such a request. Compare *Liberty Mutual Ins. Co.* v. *Lone Star Industries, Inc.*, 290 Conn. 767, 789 n.29, 967 A.2d 1 (2009) ("collateral estoppel, or issue preclusion . . . prohibits the relitigation of an issue when that issue was *actually litigated and necessarily determined* in a prior action between the same parties or those in privity with them upon a different claim" [emphasis added; internal quotation marks omitted]); see *Kalinowski* v. *Meriden*, No. 5028, CRB-8-05-11 (January 24, 2007) (discussing application of claim preclusion to workers' compensation proceedings); see also *LaSalla* v. *Doctor's Associates, Inc.*, 278 Conn. 578, 590, 898 A.2d 803 (2006) ("claim preclusion prevents the pursuit of any claims relating to the cause of action which were actually made or *might have been made*" [emphasis in original; internal quotation marks omitted]).

is one of first impression that we do not need to reach if we conclude that there is such a changed condition. Because the majority concludes that there is such a changed condition in the present case and that the plaintiff did not need to move formally to modify the prior agreement, conclusions with which I agree, I would limit our decision to that basis. Undoubtedly, a case will arise in the future in which there is no such changed condition, necessitating analysis of this unresolved issue.[8]

I also disagree, for several reasons, with the majority's reliance on an old line of cases to affirm the award on the ground that the plaintiff has demonstrated that her "subsequent disability . . . is distinct from and due to a condition that is not a normal and immediate incident of the loss for which she received permanent partial disability benefits . . . ." These cases address a particular circumstance in which there is a changed condition warranting modification of the award. See *Costello* v. *Seamless Rubber Co.*, 99 Conn. 545, 550, 122 A. 79 (1923) (quoting *Saddlemire* v. *American Bridge Co.*, 94 Conn. 618, 629, 110 A. 63 [1920], for proposition that "[w]hen the results are unusual, and are not the ordinary incidents following the amputation, and partial or total incapacity results, this is not to be attributed to the loss of the member, and is specifically included in the cases which [General Statutes (1918 Rev.) § 5355, the predecessor to § 31-315] provides shall authorize a modification of the original award" [internal quotation marks omitted]). Therefore, these cases do not bear on whether, in the *absence* of a changed condition, a claimant is entitled to total incapacity benefits after receiving permanent disability benefits.

---

[8] The amicus also raises an interesting argument that, because the plaintiff was not seeking to change the permanency benefits provided under the voluntary agreement, she did not need to modify the agreement. The plaintiff has not taken a specific position in her brief as to whether she needed to modify the agreement. Again, I would save that issue for another day.

I also am concerned that the majority's reliance on these cases may suggest that this court has adopted a narrow view of what constitutes a changed condition for purposes of § 31-315. There is precedent of more recent vintage in which claimants have recovered benefits without showing the distinct and unusual conditions contemplated in the cases cited by the majority. See, e.g., *Schiano* v. *Bliss Exterminating Co.*, 260 Conn. 21, 25–26, 792 A.2d 835 (2002); *Roswell* v. *State*, 29 Conn. App. 432, 433–34, 615 A.2d 1063, cert. denied, 224 Conn. 922, 618 A.2d 529 (1992); *Cappellino* v. *Cheshire*, 27 Conn. App. 699, 702, 608 A.2d 1185 (1992), cert. denied, 226 Conn. 569, 628 A.2d 595 (1993). Indeed, the line of cases cited by the majority arose after early holdings by this court, since limited or overruled by case law or public act, had concluded that a claimant who suffered the loss of, or loss of use of, a complete body part, upon reaching maximum medical improvement, could not receive incapacity benefits and was limited to the permanent disability benefits provided for such a loss under § 31-308 (b). See *Morgan* v. *Adams*, 127 Conn. 294, 296, 16 A.2d 576 (1940) (distinguishing holdings in *Panico* v. *Sperry Engineering Co.*, 113 Conn. 707, 156 A. 802 [1931], and *Stapf* v. *Savin*, 125 Conn. 563, 7 A.2d 226 [1939], as cases that did not involve distinct conditions following permanent disability); *McCurdy* v. *State*, supra, 227 Conn. 268–69 ("In *Osterlund* v. *State*, supra, [129 Conn.] 597–600, we overruled *Panico* and *Stapf* to the extent that they precluded a commissioner from exercising his or her discretion to continue total disability payments to a [claimant] who had reached maximum medical improvement but was still totally disabled from working. In *Osterlund*, we explained that 'there might be, in case of a partial loss of function, a great disproportion between the amount of specific compensation provided and the actual effect of the injury, either from the standpoint of the employee's

earning capacity or the physical impairment he suffered.' Id., 600.''). Notably, neither the board, the plaintiff nor the amicus cites to or relies on this line of cases, and, indeed, the proposition for which they stand appears inconsistent with the characterization of the plaintiff's condition as a deterioration or worsening of her original condition.

Having stated my points of disagreement, I next briefly explain why I agree with the majority that, even in the absence of a formal motion to modify the agreement and an express finding by the commissioner that the plaintiff's condition had changed, the award of total incapacity benefits was proper. As the Appellate Court often has explained: "Administrative hearings, such as those held before a workers' compensation commissioner, are informal and are not bound by the common-law or statutory rules of evidence and procedure. *Bryan* v. *Sheraton-Hartford Hotel,* 62 Conn. App. 733, 740, 774 A.2d 1009 (2001); see General Statutes § 31-298. . . . Nonetheless, procedural due process is a requirement of adjudicative administrative hearings, including those held before work[ers'] compensation commissioners . . . . *Balkus* v. *Terry Steam Turbine Co.,* 167 Conn. 170, 177, 355 A.2d 227 (1974). Due process of law requires not only that there be due notice of the hearing but that at the hearing the parties involved have a right to produce relevant evidence, and an opportunity to know the facts on which the agency is asked to act, to cross-examine witnesses and to offer rebuttal evidence." (Citation omitted; internal quotation marks omitted.) *Testone* v. *C. R. Gibson Co.,* 114 Conn. App. 210, 217, 969 A.2d 179, cert. denied, 292 Conn. 914, 973 A.2d 663 (2009); accord *Ryker* v. *Bethany,* 97 Conn. App. 304, 314, 904 A.2d 1227, cert. denied, 280 Conn. 932, 909 A.2d 663 (2006).

In the present case, the defendants make no claim that the plaintiff's failure to file a formal motion violated

their right to due process. The defendants knew precisely what benefits the plaintiff sought. They had ample opportunity to cross-examine witnesses and, indeed, during their deposition of Steven Beck, one of the plaintiff's physicians, specifically asked whether, at various points in time, the plaintiff's condition had improved, worsened or remained the same. The defendants' position in their posttrial brief to the commissioner was simply that the plaintiff's condition had not changed. Therefore, the plaintiff's failure to file a formal motion alleging a changed condition is not fatal.

The absence of an express finding of a changed condition is more problematic, but not insurmountable. The board previously has characterized the issue of whether there is a changed condition as a question of fact. *Saleh* v. *Poquonock Giant Grinder Shop*, No. 04005, CRB-01-99-03 (March 13, 2000) ("The determination of whether changed conditions of fact exist which support a reopening of a voluntary agreement is a question of fact. *Lyons* v. *Wasley Products, Inc.*, No. 3788, CRB-6-98-3 [June 18, 1999]; *Knudsen* v. *GSD, Inc.*, [8 Conn. Workers' Comp. Rev. Op. 81 (1990)]."). Neither the board nor the courts have the authority to find facts, as that function is relegated exclusively to the commissioner. See *DiNuzzo* v. *Dan Perkins Chevrolet Geo, Inc.*, 294 Conn. 132, 141, 982 A.2d 157 (2009) ("[n]either the . . . board nor this court has the power to retry facts" [internal quotation marks omitted]); *Biasetti* v. *Stamford*, 250 Conn. 65, 71, 735 A.2d 321 (1999) ("[t]he commissioner has the power and duty, as the trier of fact, to determine the facts" [internal quotation marks omitted]). Nonetheless, I agree with the Appellate Court and the board that the evidence credited by the commissioner necessarily compels the conclusion that the commissioner implicitly found a changed condition.

The commissioner specifically credited the medical opinion of Beck, who had treated the plaintiff for pain

management from 2000 to the date of the hearing, as well as the opinion of Albert Sabella, the plaintiff's vocational expert, who had relied on Beck's opinion as to the plaintiff's condition. The commissioner also found the plaintiff to be a credible witness. In finding unpersuasive the defendants' argument that the plaintiff was not totally incapacitated, the commissioner expressly pointed to the plaintiff's history of taking narcotic medications. The testimony and evidence credited reflected that Beck had been unable to treat effectively the severe, debilitating and chronic pain that the plaintiff experienced following her third surgery in March, 2001. Beck testified as to the progressively higher dosages and stronger types of narcotic medications that he had prescribed in attempting to treat her pain. Indeed, it appears that the only period in which he did not have to increase the plaintiff's medication was at or near the time that she executed the voluntary agreement. Beck also testified that the plaintiff's pain progression was the opposite of what he had expected when he began treating her, and that a September, 2003 nerve block had failed to diminish her pain, which in turn decreased her chances for success with other types of interventions. Finally, Beck noted that the plaintiff had sustained a fracture in the stem of a prosthesis implanted in her elbow following the third surgery and that, over a period of time, she had developed swelling and spreading of pain to a larger area of her arm and wrist than was affected when he initially had treated her. The totality of this evidence amply demonstrates a changed condition.

In disagreeing with the conclusions of the board and the Appellate Court as to the presence of a changed condition, the defendants take a narrow view of what constitutes a "changed [condition] of fact" for purposes of § 31-315, essentially viewing it as requiring an increased incapacity. I disagree with their narrow inter-

pretation. The changed condition language must be read in connection with the broad remedial language of § 31-315, which provides in relevant part: "Any award of, or voluntary agreement concerning, compensation made under the provisions of this chapter . . . shall be subject to modification in accordance with the procedure for original determinations, upon the request of either party . . . whenever it appears to the compensation commissioner, after notice and hearing thereon, that the incapacity of an injured employee has increased, decreased or ceased, or that the measure of dependence on account of which the compensation is paid has changed, *or that changed conditions of fact have arisen which necessitate a change of such agreement . . . [or] award . . . in order properly to carry out the spirit of this chapter.*" (Emphasis added.) See generally *Hunt* v. *Naugatuck*, 273 Conn. 97, 103–104, 868 A.2d 54 (2005) ("Pursuant to . . . § 31-315, a workers' compensation award is always limited to a claimant's current condition and [is] always subject to later modification upon the request of either party . . . if the complainant's condition changes. . . . Consequently, the commissioner, in any given case, may issue multiple findings and awards throughout the period of compensability, with each award fixing the claimant's benefits as of the formal hearing date on the basis of the claimant's then existing condition." [Citation omitted; internal quotation marks omitted.]). Indeed, the board previously has indicated that a treating physician's changed *perception* of a claimant's condition can provide a basis for modification. See *Kevorkian* v. *Peter Paul, Inc.*, 2 Conn. Workers' Comp. Rev. Op. 26, 28 (1983) (inferring from testimony that "there were changes in [the] claimant's condition between [the dates at issue] or at least changes in the way the doctors perceived that condition"). Therefore, I agree with the majority that the record compels the conclusion that a

finding of a changed condition necessarily is implied by the evidence credited by the commissioner. Accordingly, I agree with the majority's conclusion that the Appellate Court's judgment should be affirmed in part as to its conclusion that the plaintiff is entitled to total incapacity benefits on the basis of this changed condition.